**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | | |
|---|---|---|---|
| UNITED STATES OF AMERICA, | : | | |
| | : | | |
| Plaintiff, | : | Civil Action No.: | 20-2019 (RC) |
| | : | | |
| v. | : | Re Document No.: | 12 |
| | : | | |
| $1,827,242.65 OF FUNDS ASSOCIATED WITH COMPANY 1, *et al.*, | : | | |
| | : | | |
| Defendants. | : | | |

## MEMORANDUM OPINION

### GRANTING PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT

### I. INTRODUCTION

This action arises out of an investigation by the Federal Bureau of Investigation. Plaintiff United States of America ("the Government") seeks the forfeiture of $1,827,242.65 in funds associated with "Company 1" ("Defendant Funds 1"), $88,731 in funds associated with "Company 2" ("Defendant Funds 2"), and $456,820 in funds associated with "Company 3" and "Company 4" ("Defendant Funds 3") (collectively, the "Defendant Funds").[1] The Defendant Funds are alleged to have been involved in a scheme by financial institutions in the Democratic People's Republic of Korea ("DPRK" or "North Korea") to launder funds through the U.S. financial system in violation of U.S. sanctions against North Korea. No claimant to the assets has responded to the complaint, and the Clerk of the Court entered default on January 29, 2021. The Government now asks this Court to enter default judgment against the Defendant Funds. For the reasons set forth below, the Court grants this motion.

---

[1] Companies 1, 2, 3, and 4 are collectively "Potential Claimants."

## II. FACTUAL BACKGROUND

This case involves North Korea's alleged attempts to evade U.S. sanctions on its financial institutions. According to the Government, several unsanctioned entities operated a money laundering scheme on behalf of the DPRK. The Government alleges that the transactions involved violated the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1701, *et seq.*, and the federal anti-money laundering statute, 18 U.S.C. § 1956(a)(2)(A). The Government also alleges conspiracies to violate these laws, in turn violating 18 U.S.C. § 371 and 18 U.S.C. § 1956(h). The Government alleges that the Defendant Funds are thus subject to forfeiture under 18 U.S.C. § 981(a)(1)(C) and 18 U.S.C. § 981(a)(1)(A). The Court will briefly summarize the relevant law and describe the alleged money laundering scheme in more detail.

### A. Statutory and Regulatory Framework

#### 1. The International Emergency Economic Powers Act

The IEEPA empowers the President to impose economic sanctions in response to an "unusual and extraordinary threat . . . to the national security, foreign policy, or economy of the United States" originating outside the country. 50 U.S.C. § 1701(a). To activate these powers, the President must declare a national emergency with respect to the threat. *Id*. On November 14, 1994, President Clinton declared a national emergency regarding the proliferation of weapons of mass destruction ("WMDs"). Exec. Order No. 12,938, 59 Fed. Reg. 58,099 (Nov. 14, 1994). In 2008, President Bush declared the proliferation of WMDs by North Korea a national emergency, *see* Exec. Order No. 13,466, 73 Fed. Reg. 36,787 (June 26, 2008), and the successive Presidents of the United States have continued and expanded upon this declaration annually, most recently in June of 2021, *see, e.g.*, 86 Fed. Reg. 33,075 (June 21, 2021).

In 2005, exercising his IEEPA authority, President Bush issued Executive Order 13,382 denying access to the U.S. banking system to anyone designated as a proliferator of WMDs. Exec. Order No. 13,382, 70 Fed. Reg. 38,567 (June 28, 2005). The "WMD Proliferators Sanctions Regulations," which implement Executive Order 13,382, block any property interests, including money and other financial instruments, belonging to or used in support of individuals and entities designated as WMD proliferators. 31 C.F.R. §§ 544.201, 544.308. Those individuals and entities are placed on the "Specially Designated Nationals and Blocked Persons List" (the "SDN" list) administered by the Department of Treasury's Office of Foreign Assets Control ("OFAC"). *See id.* § 544.201(a). Department of Treasury regulations bar the "provision of funds, goods, or services by, to, or for the benefit of any person" designated as an SDN, unless OFAC licenses the transactions. *Id.* § 544.201(b); *see also id.* §§ 544.202(c), 544.301, 544.405.

Additionally, the North Korea Sanctions Regulations prohibit transactions in the U.S. that support the Government of North Korea or the Workers' Party of Korea. Pursuant to Executive Order 13,687, the regulations block property and funds in the United States belonging to any person who is "owned or controlled by" or who has "acted or purported to act for or on behalf of, directly or indirectly, the Government of North Korea." 31 C.F.R. § 510.201(a)(3)(iii). The regulations further block property belonging to persons owned or controlled by any other person whose interests and property are blocked pursuant to the regulations, *see id.* §§ 510.201(a)(3)(ii)(F); 510.201(a)(3)(iii)(E), and property belonging to any person who provided financial support to other designated persons, *see id.* §§ 510.201(a)(3)(ii)(E) (citing Exec. Order 13,551). The persons who fit into these various sanctioned categories are designated by the Secretary of the Treasury, *see generally id.* § 510.201, and all transactions with designated entities require a license or other authorization by OFAC, *see id.* § 510.202.

3

Section 206 of the IEEPA makes it "unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under" the IEEPA. 50 U.S.C. § 1705(a). Property "which constitutes or is derived from proceeds traceable to" an IEEPA violation is subject to forfeiture. 18 U.S.C. § 981(a)(1)(C). "This chain of interlocking statutes can thus be summarized as follows: property that 'constitutes or is derived from proceeds traceable to' violations of executive orders and [regulations] promulgated pursuant to the IEEPA is subject to forfeiture." *In re 650 Fifth Avenue & Related Props.*, 830 F.3d 66, 87 (2d Cir. 2016) (citing 18 U.S.C. §§ 981(a)(1)(C), 1956(c)(7)(D); 50 U.S.C. § 1705).

### 2. The Federal Anti-Money Laundering Statute

The federal anti-money laundering statute criminalizes transporting, transmitting, or transferring a monetary instrument or funds in or out of the United States "with the intent to promote the carrying on of specified unlawful activity," or conspiring to do so. 18 U.S.C. §§ 1956(a)(2)(A), (h). "Specified unlawful activity" includes violations of the IEEPA. *Id.* § 1956(c)(7)(D). Any property involved in a transaction violating the statute is subject to forfeiture. *Id.* § 981(a)(1)(A). To show that the property was "involved in" such a transaction, the government must show that "there was a substantial connection between the property and the offense." *Id.* § 983(c)(3).

### 3. Conspiracy

Federal statute also criminalizes a conspiracy by "two or more persons . . . either to commit any offense against the United States, or to defraud the United States." 18 U.S.C. § 371. Such offenses include conspiracy to violate the IEEPA and the federal anti-money laundering statute, discussed above.

## B. Relevant Facts and Procedural History

The Government outlines in its verified complaint a money laundering scheme operated by state-run North Korean banks to support the DPRK's proliferation of WMDs in violation of U.S. and international sanctions. Before discussing the alleged scheme, the Court will briefly describe the current state of the North Korean financial sector.

Due to the DPRK's continued pursuit of nuclear weapons, the United Nations Security Council unanimously approved a resolution requiring all U.N. member states to prohibit financial institutions from doing business with North Korean banks. Compl. ¶ 30, ECF No. 1. Because the DPRK is thus cut off from the international financial system, its state-controlled financial institutions allegedly operate a network of front companies and criminal organizations to circumvent these sanctions and conduct international financial transactions to fund development of nuclear weapons and otherwise fund the North Korean military. *Id.* ¶¶ 32, 81.

One such institution is North Korea's Foreign Trade Bank ("FTB"), which OFAC designated in 2013. *Id.* ¶¶ 17, 36. In addition to being the central institution for North Korea's foreign currency transactions, the Government alleged in a May 2020 indictment that the "FTB has laundered over $2.5 billion through the United States as part of an ongoing money laundering and sanction evasion scheme" involving multiple covert FTB branches around the world. *Id.* ¶ 38. The Government alleges that the Defendant Funds in this action are comprised of transactions conducted by front companies and other affiliates of various FTB branches.

The Government first alleges that Company 1 conducted several of these transactions in 2017. *Id.* ¶ 46–62. On April 25, 2017, Company 1 wired approximately $410,000 to Velmur Management Pte. Ltd., which has been designated by OFAC for importing gasoil into North Korea and is allegedly a front company for the Vladivostok branch of the FTB. *Id.* ¶¶ 47–49.

Another alleged front company, Apex Choice,[2] sent $214,983 to Company 1 on May 23, 2017, and a company related to Apex sent a subsequent wire to Company 1 for $99,983 on May 31, 2017. *Id.* ¶¶ 50–52. The same year, Company 1 further wired $150,000 to "Cooperating Company A" as part of a scheme involving the Thailand branch of the FTB to export workers from and generate revenue for North Korea. *Id.* ¶¶ 53–56. Company 1 received two wires totaling $599,619 from a front company for the Shenyang branch of the FTB on May 31 and June 1, 2017. *Id.* ¶ 57. On June 7, 2017, under the direction of North Korean nationals operating the Kuwait branch of the FTB, Company 1 sent a payment of approximately $134,935.82 to a Kuwaiti state economic development fund. *Id.* ¶ 58. Company 1 further sent five payments between April 3, 2017, and June 5, 2017, totaling $319,720.74 to Sunico, a company designated by the Australian government as a "North Korean associated company that has facilitated proliferation-related activity" and has violated sanctions. *Id.* ¶¶ 59–60. Finally, Company 1 received $334,599.54 across three wires from a front company of North Korea's First Credit Bank. *Id.* ¶ 61. The above transactions total at least $2,263,840.47. *Id.* ¶ 62.

Defendant Funds 1 are comprised of funds from sixteen subsequent transactions between Company 1 and twelve counterparties,[3] which included FTB Kuwait and Sunico, "as well as other FTB front companies." *Id.* ¶ 63. These transactions were frozen by Correspondent Banks

---

[2] The Government notes that it "previously filed a forfeiture complaint, 18-cv-2746 (RC), alleging Apex Choice ('Apex') [sic] of laundering funds for FTB." Compl. ¶ 50. However, in that case, the Government stipulated to dismissal of counts against Apex and the associated funds after Apex filed an answer to the complaint. Stip. of Partial Dismissal, *United States v. $599,930.00 of Funds Associated with Cooperating Company 1*, No. 18-cv-2746 (May 14, 2021), ECF No. 41.

[3] The Government mistakenly noted "Defendant Funds 1 are comprised of 12 subsequent transactions," Compl. ¶ 63, but in the next sentence refers to "[t]hese 16 transactions," *id.*, and shows sixteen individual transactions in the table listing the frozen wires, *see* Compl. ¶ 4.

in New York as they made their way through the U.S. financial system.[4]  *Id.*  The sum of these funds is $1,827,242.65.  *Id.*  The Government provides a breakdown of individual transactions, but the Government does not specifically identify the counterparties beyond assigning them numbers (e.g. "Counterparty 1").  *See id.* ¶ 4.

The Government next alleges in its complaint that Company 2 picked up where Company 1 left off with these illicit transactions.  *Id.* ¶ 64–66.  "Company 2 was incorporated in Singapore approximately two months after Company 1's last U.S. dollar payment was seized by the government."  *Id.* ¶ 64.  In August 2017, Company 2 received two wire transfers totaling approximately $246,244.12 from a Czech bank, with both wire references indicating that the funds were the closed balance of Company 1's bank account.  *Id.* ¶ 65.  Company 2 then received and sent two wires on August 29, 2017, and September 11, 2017, respectively, for $33,000 with Kisgum Co. Ltd., which had been previously alleged to be a front company for the Thailand branch of the FTB.  *Id.* ¶¶ 67–68.  The Government notes that the practice of moving funds in this circular manner is part of a money laundering practice known as "layering," which aims to conceal the source, nature, and origin of the funds.  *Id.* ¶ 69.  Company 2 further received a wire from an Apex affiliate for $400,000 on September 5, 2017.  *Id.* ¶ 70.

Defendant Funds 2 are comprised of funds from three subsequent transactions between Company 2 and entities associated with the FTB that were frozen by Correspondent Banks in

---

[4] The Government defines "Correspondent Banks," based on a regulation codified outside the North Korea Sanctions Regulations, as "banks in the United States" at which "[f]oreign financial institutions maintain U.S. dollar bank accounts."  Compl. ¶ 14.  The Government further states that "[c]orrespondent bank accounts are broadly defined to include any account established at a Correspondent Bank for a foreign financial institution wherein the Correspondent Bank receives deposits from, or make payments or disbursements on behalf of, the foreign financial institution, or handles other financial transactions, such as currency conversions, related to such foreign financial institution."  *Id.* (citing 31 C.F.R. § 1010.605).

New York as they made their way through the U.S. financial system.  *Id.* ¶ 72.  The sum of these funds is $88,731.  *Id*.  The Government alleges that the three counterparties to these transactions were part of FTB's money laundering and sanction evasion scheme.  *Id.*

The Government further alleges based on a "confidential reliable source" that both Company 1 and Company 2 operated under the direction of an officer from North Korea's intelligence agency, the Reconnaissance General Bureau ("RGB"), which is involved in conventional arms trade, runs North Korea's major cyber operations, and is a designated entity in the United States.  *Id.* ¶¶ 73–74.

Finally, the Government alleges that Company 3 laundered funds to Company 4 and that both entities have previously laundered funds for North Korea.  Company 3 allegedly sent a wire in 2017 of $575,000 to Cooperating Company A for the benefit of the Thailand branch of the FTB.  *Id.* ¶ 80.  Company 4 had previously received and sent wire transfers totaling $2,595,584.73 and $762,138, respectively, from and to the Chi Yupeng Network of Companies, which this court previously found probable cause to show was a criminal network operated by Chi Yupeng.  *Id.* ¶¶ 81, 83–84.  OFAC has stated that Chi Yupeng conducted several transactions on behalf of North Korean interests, including the WMD program.  *Id.* ¶ 82.

Defendant Funds 3 is comprised of funds from a transaction between Company 3 and Company 4 worth $456,820.  *Id.* ¶ 86.  These funds were frozen by a Correspondent Bank in New York as they transited through the U.S. financial system.  *Id.*

To summarize, the Government alleges that Potential Claimants all laundered money for the benefit of sanctioned North Korean banks such as the FTB, and that the laundered funds went to known North Korean financial facilitators who used the funds for illegal procurement on

behalf of North Korea. The Defendant Funds are comprised of transactions involving the four companies that were intercepted by law enforcement. *Id.* ¶ 89.

### III. LEGAL STANDARD

Default is appropriate for *in rem* forfeiture actions. *United States v. All Assets Held in Account No. XXXXXXX*, 330 F. Supp. 3d 150, 156 (D.D.C. 2018). Default judgment requires a two-step process. Fed. R. Civ. P. 55. First, when a defendant fails to plead or defend against the claims, the moving party must request that the Clerk of the Court enter default. Fed. R. Civ. P. 55(a). "Because a *res* typically cannot respond on its own behalf, unless a claimant properly intervenes to raise defenses to its forfeiture, the defendant property is deemed to have 'failed to plead or otherwise defend' against the allegations, and the Clerk of Court must enter default." *All Assets Held in Account No. XXXXXXX*, 330 F. Supp. 3d at 156 (quoting Fed. R. Civ. P. 55(a)).

Second, the party must request that the court enter default judgment against the defaulting party. Fed R. Civ P. 55(b)(2). Before the court enters default judgment, it "must satisfy itself that it has personal jurisdiction." *All Assets Held in Account No. XXXXXXX*, 330 F. Supp. 3d at 155 (internal quotation marks omitted). The court must also establish that the allegations of the complaint, if true, are legally sufficient to make a claim. *Gutierrez v. Berg Contracting Inc.*, No. 99-cv-3044 (TAF), 2000 WL 331721, at *2 (D.D.C. Mar. 20, 2000).

Default judgment is typically available "only when the adversary process has been halted because of an essentially unresponsive party. In that instance, the diligent party must be protected lest he be faced with interminable delay and continued uncertainty as to his rights." *Jackson v. Beech*, 636 F.2d 831, 836 (D.C. Cir. 1980) (quoting *H.F. Livermore Corp. v. Aktiengesellschaft Gebruder Loepfe*, 432 F.2d 689, 691 (D.C. Cir. 1970)); *see also Gilmore v.*

9

*Palestinian Interim Self-Gov't Auth.*, 843 F.3d 958, 965 (D.C. Cir. 2016). However, "a defendant's failure to appear . . . do[es] not automatically entitle plaintiff to a default judgment." *Jackson v. Corr. Corp. of Am.*, 564 F. Supp. 2d 22, 26 (D.D.C. 2008) (cleaned up). Rather, "the defendant's default notwithstanding, the plaintiff is entitled to a default judgment only if the complaint states a claim for relief." *Id.* at 27 (quoting *Descent v. Kolitsidas*, 396 F. Supp. 2d 1315, 1316 (M.D. Fla. 2005)). In other words, "[d]efault establishes the defaulting party's liability for the well-pleaded allegations of the complaint," but not for allegations that are not sufficiently pleaded. *Boland v. Elite Terrazzo Flooring, Inc.*, 763 F. Supp. 2d 64, 67 (D.D.C. 2011) (citing *Adkins v. Teseo*, 180 F. Supp. 2d 15, 17 (D.D.C. 2001)).

## IV. ANALYSIS

The Government asks this Court to grant forfeiture of the Defendant Funds. Rule G of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions governs *in rem* civil-forfeiture actions arising from federal statutes. Fed. R. Civ. P. Supp. R. G(1). Rule G contains both notice and substantive pleading requirements.[5] Fed. R. Civ. P. Supp. R. G(2), (4). Because the Government properly notified all the interested parties and sufficiently alleged that the Defendant Funds are subject to forfeiture, the Government's motion for default judgment is granted.

---

[5] Supplemental Rule G also requires that if—as is the case here—the subject of the seizure is not real property, the "clerk must issue a warrant to arrest the property if it is in the government's possession, custody, or control." Fed. R. Civ. P. Supp. R. G(3)(b)(i). The funds at issue here are in the government's control. *See* Compl. ¶ 8 ("The Defendant Funds are currently held in a government-controlled bank account in the United States, pursuant to a previously executed seizure warrant."). And the Clerk of Court issued a warrant for the funds' arrest one day after the Government filed its complaint. *See* Warrant for Arrest *in Rem*, ECF No. 3. The government has thus met this Supplemental Rule G requirement.

### A. Notice

To satisfy Supplemental Rule G's notice requirements, the Government must (1) publish public notice of the forfeiture action and (2) provide direct notice to the potential claimants of the assets to be forfeited. Fed. R. Civ. P. Supp. R. G(4)(a)–(b). One acceptable method of public notice is publication on an official government forfeiture website for at least thirty consecutive days. Fed. R. Civ. P. Supp. R. G(4)(a)(iv)(C). The public notice must "describe the property with reasonable particularity," "state the times . . . to file a claim and to answer," and "name the government attorney to be served." Fed. R. Civ. P. Supp. R. G(4)(a)(ii). The government must also "send notice of the action and a copy of the complaint to any person who reasonably appears to be a potential claimant." Fed. R. Civ. P. Supp. R. G(4)(b)(i). The notice "must be sent by means reasonably calculated to reach the potential claimant." Fed. R. Civ. P. Supp. R. G(4)(b)(iii)(A). The direct notice must contain "the date when the notice is sent," the "deadline for filing a claim, at least 35 days after the notice is sent," "that an answer or a motion under Rule 12 must filed no later than 21 days after filing the claim," and "the name of the government attorney to be served." Fed. R. Civ. P. Supp. R. G(4)(b)(ii). Finally, the rule requires only "that the government attempt to provide actual notice; it does not require that the government demonstrate that it was successful in providing actual notice." *United States v. $1,071,251.44 of Funds Associated with Mingzheng Int'l Trading Ltd.*, 324 F. Supp. 3d 38, 47 (D.D.C. 2018) (quoting *Mesa Valderrama v. United States*, 417 F.3d 1189, 1197 (11th Cir. 2005)).

Here, the Government has satisfied the applicable notice requirements. The Government posted public notice on a proper government forfeiture website for the requisite thirty consecutive days beginning on July 31, 2020. Decl. of Publication, ECF No. 5; Decl. Supp. Default ¶ 8, ECF No. 7. The public notice described the amount of each frozen transaction, the

date each was frozen, and the bank through which the funds were moving.  Decl. of Publication.  The public notice also stated the time by which an answer or Rule 12 motion needed to be filed as well as the government attorney to be served.  *Id.*  No verified claim was filed by the September 29, 2020 deadline.  Decl. Supp. Default ¶ 8.  The Government has also complied with Supplemental Rule G's direct notice requirement.[6]  The Government sent direct notice of the action and a copy of the complaint to all known potential claimants via first class mail on or about July 29, 2020.  Decl. Supp. Default ¶¶ 5–6.  No verified claim was filed by the thirty-five-day deadline of September 2, 2020.  Decl. Supp. Default ¶ 7.  As such, the Government has satisfied its obligation to provide both public and direct notice.  *See* Fed. R. Civ. P. Supp. R. G(4)(a)(iv)(C).

### B.  Adequacy of the Complaint

The Government's complaint in an *in rem* forfeiture action must also meet Supplemental Rule G's substantive pleading specifications.  Fed. R. Civ. P. Supp. R. G(2).  The complaint must (1) be verified, (2) state the grounds for jurisdiction and venue, (3) "describe the property with reasonable particularity," (4) "identify the statute under which the forfeiture action is brought," and (5) "state sufficiently detailed facts to support a reasonable belief that the government will be able to meet its burden of proof at trial."  Fed. R. Civ. P. Supp. R. G(2).

---

[6] Supplemental Rule G states that a direct notice must contain (1) the date on which the notice is sent, (2) the deadline for filing a claim, at least thirty-five days after the notice is sent, (3) a statement that an answer or Rule 12 motion must be filed within twenty-one days of filing a claim, and (4) the name of the government attorney to be served with the claim and answer.  Fed. R. Civ. P. Supp. R. G(4)(b)(ii).  The Government does not allege particular facts demonstrating that it has met these requirements.  The Government merely states that it "identified all known potential claimants" and sent notice to them via first class mail "on or about July 29, 2020," Decl. Supp. Default ¶ 6, and "gave notice of this action to all known potential claimants pursuant to the procedures set forth in Rule G(4) of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions," *id.* ¶ 5.  Nevertheless, the Court accepts these assertions as sufficient.

Courts consider those requirements to establish a "higher standard of pleading" than that imposed by Federal Rule of Civil Procedure 8.  *United States v. All Assets Held at Bank Julius Baer & Co., Ltd.*, 571 F. Supp. 2d 1, 16 (D.D.C. 2008).  Nevertheless, Rule 8 "may help to clarify when a civil forfeiture complaint" states a claim.  *United States v. $22,173.00 in U.S. Currency*, 716 F. Supp. 2d 245, 249 (S.D.N.Y. 2010).

The first four requirements are mostly formal and are easily met here: (1) the complaint is verified; (2) it identifies the basis for jurisdiction and venue; (3) it describes the property at issue by detailing the amount of money, the date of each wire, and the originator and the beneficiary of each wire pseudonymously; and (4) it identifies the statutes under which forfeiture is sought, 18 U.S.C. §§ 981(a)(1)(A), (C), thus permitting the forfeiture of property involved in money laundering, derived from or traceable to IEEPA violations, or both.  *See* Compl. at 28, ¶¶ 4, 6–8.

The fifth requirement is more substantive and requires the Government to establish the legal basis for the forfeiture.  *See Mingzheng*, 324 F. Supp. 3d at 51.  The Government's forfeiture theory can be summarized as follows: The Defendant Funds are subject to forfeiture because (1) they constitute or are derived from proceeds traceable to violations of (or conspiracy to violate) sanctions and regulations against North Korea promulgated under the IEEPA, and (2) they are property involved in, or property traceable to property involved in, money laundering or conspiracy to launder money.  The Government must "state sufficiently detailed facts to support a reasonable belief that" it can meet its burden at trial to show the above-mentioned statutory violations occurred—a standard "which is not particularly onerous." Fed. R. Civ. P. Supp. R. G(2)(f); *Mingzheng*, 324 F. Supp. 3d at 51.

1. IEEPA Violation

Using the Statutory and Regulatory Framework detailed above, *supra* II.A.1., this Court consistently interprets that "[a]ny entity that transacts with or on behalf of . . . North Korean SDNs, through the United States financial system, must first obtain a license from OFAC."[7] *United States v. $6,999,925.00 of Funds Associated with Velmur Management Pte. Ltd.*, 368 F. Supp. 3d 10, 19 (D.D.C. 2019) (citing 31 C.F.R. § 544.201(a)); *see United States v. All Wire Transactions Involving Dandong Zhicheng Metallic Material Co., Ltd.*, Nos. 17-mj-217, *et al.*, 2017 WL 3233062, at *1, *5 (D.D.C. May 22, 2017) (explaining that foreign entities that are acting on behalf of North Korean SDNs have committed violations of IEEPA and the anti-money laundering statute by conducting unauthorized United States dollar wire transfers).

In *Velmur*, which similarly involved a default judgment motion for a civil *in rem* forfeiture action based on the IEEPA, the government met its Rule G burden by alleging (1) the scheme by North Korean banks to subvert United States sanctions, (2) the potential claimant's involvement in this scheme, (3) the details of transactions involving the defendant funds, and (4) that confidential sources could confirm the illicit activities behind the transactions. *See* 368 F. Supp. 3d at 20. While not a formal test, this combination of factors convincingly established a "reasonable belief" that the Government would meet its burden at trial. Notably, although

---

[7] The Government suggests the following test for a civil IEEPA violation: "the United States must establish: (1) an illegal export or provision of services; (2) failure to obtain the necessary license from OFAC; and (3) the defendant knew that a license was required." Mot. at 10 (citing *United States v. Quinn*, 403 F. Supp. 2d 57, 65 (D.D.C. 2005) (criminal); *United States v. All Funds on Deposit in United Bank of Switzerland*, No. 01 Civ. 2091, 2003 WL 56999, at *2 (S.D.N.Y. Jan. 7, 2003) (civil)). This argument may not accurately describe the case law presented (for example, the court in *Quinn* did not clearly endorse this test, 403 F. Supp. 2d at 65), and it may also reflect an unnecessarily restrictive view of the IEEPA sanctions for the present case by limiting the language to "an illegal export or provision of services" and by retaining a *mens rea* element specific to criminal cases.

Velmur had been designated as an SDN, the illicit nature of the transactions was more dispositive than Velmur's own OFAC designation. *See id.* ("The funds were sent by SDN front companies to Velmur for the purpose of making transactions on behalf of those SDNs. That . . . OFAC subsequently designated Velmur and IPC as SDNs[] add[s] additional weight to this conclusion.").

In detailing the transactions, the Government is not required to disclose the identity of each party to a transaction, but it should be clear that the Government knows their identity and their connection to the sanction evasion scheme. For example, in *Mingzheng*, the court noted about one of the transactions that "[a] payment of $140,000 was made to Mingzheng from a company that had recently been registered in Hong Kong, and that had the hallmarks of a front company for the [FTB]." 324 F. Supp. 3d at 53; *see also Velmur*, 368 F. Supp. 3d at 22 ("Velmur received more than $250,000 from Company A, which a confidential source identified as an FTB front company." (cleaned up)). For ten of the transactions described in *Mingzheng*, the Government described how each of the unnamed parties were allegedly involved with SDNs. *See* 324 F. Supp. 3d at 52–53. For the other ten transactions not individually detailed in *Mingzheng*, the court accepted as sufficient their link to the FTB via "coded payment instructions from [FTB]." *Id.* at 52.

Here, the Government has pled sufficient detail to establish "a reasonable basis" that it would meet its burden at trial. First, the Government extensively alleged a scheme by North Korean banks to access the United States financial system and evade sanctions; the Complaint cites FinCEN, the House Foreign Affairs Committee, and the U.N. Security Council's Panel of Experts on various findings regarding the deceptive practices of North Korean financial institutions. *See* Compl. ¶¶ 18–46.

Second, the Government alleges how Potential Claimants are involved in North Korea's sanction-evasion scheme. Specifically, the Government described transactions between Company 1 and seven known North Korean financial facilitators in 2017. Defendant Funds 1 comprise a series of sixteen more transactions involving Company 1 to which the counterparties are allegedly the FTB, FTB front companies, and other designated entities. *Id.* ¶¶ 4, 63. Because OFAC describes the FTB as "a key financial node in North Korea's WMD apparatus," *id.* ¶ 35, Company 1's involvement with the FTB further supports that this company's transactions in the U.S. are likely illicit. Company 2 is allegedly a front company of Company 1 that stepped in after the United States froze Company 1's funds. *Id.* ¶ 66. Supporting this allegation, the Government explains that "Company 2 was incorporated in Singapore approximately two months after Company 1's last U.S. dollar payment was seized by the government," *id.* ¶ 64, and the wire references for two transactions from a Czech bank to Company 2's Singapore bank account indicate that the transfers were for the closed balance of Company 1's account, *id.* ¶ 65.

To show generally that Companies 1 and 2 both acted on behalf of North Korean entities, the Government points to a "confidential reliable source" who can confirm that both companies operated under the direction of an RGB officer who was tracking payments and fabricating records in a manner that the Government alleges is characteristic of schemes to deceive U.S. banks. *Id.* ¶ 74–77. The confidential source further provided to the Government a spreadsheet tracking these payments. *Id.* ¶ 75. The level of detail here is akin to the allegations in *United States v. $429,000.00 of Blocked Funds Associated with Ryer International Trading, Ltd.*, in which the Government detailed transactions between the potential claimants and SDNs and pointed to documents that could verify some of the information, *see* No. 20-cv-2546, 2021 WL 5050070, at *7–8 (D.D.C. 2021), and the allegations in *Velmur*, in which the Government

detailed the transactions and that confidential sources could confirm their illicit nature, *see* 368 F. Supp. 3d at 20.

Similarly, to show Company 3's involvement in the scheme, the Government alleges that Cooperating Company A admits to facilitating money laundering and contracting to export commodities ultimately destined for North Korean trade companies. Compl. ¶¶ 78–79. Cooperating Company A shared that Company 3 provided it with financial support "for the benefit of FTB Thailand." *Id.* ¶ 80. Regarding Company 4, the Government points to the Chi Yupeng Network of Companies, for which probable cause had previously been shown that they transacted over $600 million illegally through the United States, Compl. ¶ 81; *see Dandong Zhicheng*, 2017 WL 3233062, at *5, and notes that one of the companies in the network was designated by OFAC in 2017 for purchasing items such as nuclear and missile components for North Korea, Compl. ¶ 82. Company 4 allegedly fit into this scheme by receiving 41 U.S.-dollar wires from the Chi Yupeng Network and sending six wires back to the Network. Compl. ¶¶ 83–84. In *Ryer*, one of the main counterparties had pled guilty for conspiracy to violate the IEEPA in a previous case. *See* 2021 WL 5050070, at *7. The court found that this fact and the general availability of the documents from the legal proceedings supported that the potential claimant was acting on behalf of SDNs and weighed in favor of granting default judgment. *Id.* at *7–8. The same is true here.

Together with the framework of Potential Claimants' involvement in the North Korean sanction-evasion scheme, the Government provides sufficient detail about the frozen funds themselves to suggest that the Funds are forfeitable. The Government breaks down the Defendant Funds into a list of the individual blocked transactions that comprise them, listing them by dollar amount, date, and pseudonymous parties. Compl. ¶ 4. While the Government did

not identify the parties to each individual transaction by name, there is enough information to suggest that the Government can identify them and show how they connect to the illicit scheme. *See Mingzheng*, 324 F. Supp. 3d at 52–53. For example, regarding Defendant Funds 1, the Government alleges that "[t]he 12 counterparties to these transactions included many of the above-identified entities, such as Sunico and FTB Kuwait, as well as other FTB front companies." *Id.* ¶ 63. All the transactions comprising the Defendant Funds succeeded previous illicit transactions, also described in the Complaint, which led to U.S. banks freezing the Defendant Funds per OFAC regulations.

The Government has provided a sufficient level of detail for its IEEPA claim to meet Supplemental Rule G's substantive pleading specifications. As detailed above, the Government identifies the specific transactions underlying the Defendant Funds, how both the transactions and the potential claimants behind them are involved in the scheme to support North Korea in evading United States sanctions, and that the Government can corroborate its information with (at a minimum) a confidential source, a cooperating company that played a role in the scheme, and several documents supporting the allegations. For all the described transactions, the actors failed to obtain OFAC licensing. Compl. ¶ 8. There is a reasonable belief based on the facts alleged that the Government would meet its burden of proof at trial to show that the Defendant Funds constitute or are derived from proceeds traceable to IEEPA violations.

The Government also argues that Potential Claimants conspired to commit a violation of the IEEPA in violation of 50 U.S.C. § 1705 and 18 U.S.C. § 371. Mot. at 11.[8] Because the

---

[8] Property that "constitutes or is derived from proceeds traceable to" "a conspiracy to commit" "any offense constituting 'specific unlawful activity,'" e.g., an IEEPA violation, is subject to forfeiture. 18 U.S.C. § 981(a)(1)(C).

conspiracy count serves only as an alternative theory for relief, it is unnecessary for the Court to consider this argument after finding for the Government on the IEEPA violation claim itself.

### 2. Money Laundering

The second statute under which the Government claims it is entitled to forfeiture is 18 U.S.C. § 981(a)(1)(A) due to violations of the federal anti-money laundering statute, 18 U.S.C. §§ 1956(a)(2)(A), (h).  Again, this is an alternative theory for relief that is moot upon the finding that the Government met its substantive pleading requirement on the IEEPA claim.  Accordingly, the Court will not rule on the money laundering violation claims.

\*               \*               \*

Under Supplemental Rule G, the Government properly notified all the potential parties and sufficiently alleged that the Defendant Funds are subject to forfeiture as funds constituting or deriving from proceeds traceable to violations of the IEEPA.  Accepting the well-pleaded allegations as true, the Court finds that default judgment and forfeiture are appropriate on Counts 1 and 2 of the Complaint.

## V. CONCLUSION

For the foregoing reasons, this Court **GRANTS** the Government's motion for default judgment (ECF No. 12).  Judgment is entered in favor of the United States and against the potential claimants of the Defendant Funds, and the Defendant Funds are forfeited to the Government.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated: January 6, 2022                                                                RUDOLPH CONTRERAS
                                                                                      United States District Judge